UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-cv-23632

TEMPEST, LLC,

     Plaintiff,

vs.

GLOBAL AEROLEASING, LLC;
JASON BAUMANN;
PATRIOT DYNAMICS, LLC,
PRIMETECH RESOURCES LLC;
ZACH JANZEN;

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, TEMPEST, LLC, by and through its undersigned attorneys, and files this action against GLOBAL AEROLEASING, LLC; PRIMETECH RESOURCES LLC; JASON BAUMANN; PATRIOT DYNAMICS, LLC; ZACH JANZEN; and alleges:

### PARTIES

1.     Plaintiff, Tempest, LLC ("Tempest") is a Nevada limited liability company, with its principal place of business in Reno, Nevada.

2.     Tempest's sole Member, Eric Litak, is a citizen of the State of Nevada.

3.     Defendant, Global Aeroleasing LLC ("GAL") was a Florida limited liability company, with its principal place of business in Miami, Florida. The sole member of the Defendant was Michael Sheldon, who is a citizen of the State of Florida.

1

4.      Defendant, Patriot Dynamics LLC, is a Florida Limited Liability Company with its principal place of business in Miami, Florida.  The members of the Defendant are Jason Baumann, who is a citizen of the State of Florida and Michael Sheldon, also a citizen of the State of Florida.

5.      Defendant, Primetech Resources LLC (hereinafter "Primetech") is a Florida limited liability company with its principal place of business in Miami, Florida.  The sole member of the Defendant is Jason Baumann, who is a citizen of the State of Florida.

6.      Defendant, Jason Baumann ("Jason"), is a citizen of the State of Florida.

7.      Defendant Zach Janzen ("Zach") is a citizen of the State of South Carolina.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of attorneys' fees and costs.

9.      The Court has general personal jurisdiction over Defendants due to their substantial, repeated and not isolated business activities, in the ordinary course of commerce, trade or use, within this District and Division, which caused harm to Plaintiff.

10.     The Court has specific personal jurisdiction over Defendants because they committed acts and omissions both without and within this District and Division, in the ordinary course of commerce, trade or use, and also by making knowingly false representations to Plaintiff in this District, which cased harm to Plaintiff.

11.     Venue is proper in this District pursuant to U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**GENERAL ALLEGATIONS**

12.     In February of 2021, Eric Litak retained Evan Winsor ("Evan"), a licensed pilot, to provide aviation consulting services related to the acquisition of airplanes and airplane parts.

13.     Shortly after Evan was retained, Evan began researching potential opportunities for the purchase of C-130 Hercules ("Sudanese C-130s") aircraft.

14.     The C-130 is a four-engine turboprop military transport aircraft designed and built originally by Lockheed (now Lockheed Martin). The C-130 is capable of using unprepared runways for takeoffs and landings and it was originally designed as a troop, medevac, and cargo transport aircraft. Today, the C-130 is also used for airlift purposes unrelated to tactical military objectives, such as aeromedical missions, weather observation, as well as firefighting and disaster relief missions. The C-130 can accommodate a wide variety of oversized cargo, including utility helicopters, armored vehicles, and various palletized cargo.

15.     Evan came to meet Jason through Sam Knaub, another aviation professional.

16.     In May of 2021, Sam Knaub told Evan that he knew a gentleman by the name of Carlos Gomez, who had a connection to be able to purchase C-130 aircraft that were in Sudan. Gomez's connection to the aircraft was Jason Baumann.

17.     On May 26, 2021, Evan and Jason spoke for the first time about acquiring the aircraft from Sudan. Jason told Evan that he had been to Sudan 2-3 months prior and inspected the aircraft. During the initial conversation Jason had with Evan, Jason told Evan that he was a consultant and broker in aviation business matters. He also told Evan that he was partners with an individual named Michael Sheldon ("Michael"), who is the owner and President of Global Aeroleasing, LLC ("GAL").

18. During the initial discussion, Jason advised Evan that Jason knew of two Sudanese C-130s, which were in the Northeast African nation of Sudan, and were for sale. Jason told Evan that he had been to Sudan 2-3 months prior; and inspected the Sudanese C-130s aircraft for purposes of scrapping the aircraft for parts.

19. Despite Jason's initial plan to scrap the aircraft, he suggested to Evan that the aircraft could be purchased, repaired, flown out, recertified, and used in the United States.

20. On the call, Jason told Evan that he and Carlos could go to Sudan and broker a deal for the purchase of the Sudanese C-130s, and once purchased the airplanes would be moved to Jordan.

21. During the call on May 26, 2021, Jason told Evan that it would probably cost Eric around $1,000,000.00 to get the aircraft airworthy again. That amount would cover the inspection and survey of the aircraft, light maintenance in Sudan, and more intensive repairs once in Jordan. The $1,000,000.00 was not a purchase price for the aircraft.

22. After speaking with Jason about the aircraft Sudanese C-130s, Evan relayed the potential opportunity to Eric Litak ("Eric").

23. Tempest, LLC ("Tempest") was formed on June 10, 2021, by its sole member, Eric Litak. Tempest is a business that engages in multiple facets of the aviation industry. One facet of its business focuses on the acquisition of aircraft and aircraft parts.

24. Eric, acting as the sole member of Tempest, instructed Evan to diligently pursue the steps needed to develop a business plan for the purchase of these aircraft.

25. Evan on the other hand became an agent for Tempest and was delegated the authority to arrange and address matters relevant to the purchase of aircraft and parts on behalf of Tempest.

26.     On June 11, 2021, Jason, while acting individually and on behalf of Primetech and GAL, represented to Evan via telephone, that there were certain airplane parts that were "assets" Jason, and Michael owned, along with GAL, and they were stored in a secured hangar in Ohio. Jason represented that these Parts were for a C-130E aircraft (hereinafter "the Parts"), and it would make sense for Eric Litak to buy those assets to use as parts for the Sudanese C-130s aircraft, because everyone involved understood the C-130 Parts were compatible.

27.     Jason represented the Parts would be procured through their assistance because they were already at a hangar in Ohio and could be used as Parts for the Sudanese C-130s.  Jason also indicated the Parts could be purchased by Eric and then resold again by Jason, and Michael Sheldon.

28.     In connection with the effort to sell the parts to Tempest, Jason wrote an email to Evan on June 11, 2021, discussing a portion of the conversation that occurred earlier that day, indicating that this was a "much less complex deal than operation 'Sudan'."  See Email Attached as **Exhibit 1**.

29.     Throughout their discussions with Evan, Jason made the following representations regarding the Parts explicitly represented to be in Ohio:

   a. On or about June 11, 2021, during a phone call, Jason represented to Evan that the Parts were being properly stored in a hangar at Rickenbacker Airport in the State of Ohio;

   b. In a June 11, 2021 e-mail, Jason represented to Evan that the Ohio Parts had a total value of $2,200,000.00. Specifically, the wing box ("C-130 CWB") had a value of $1,200,000.00 alone and the wings were worth $1,000,000.00.

30.     Because Sudan has a history of violent conflicts, unstable government, and limited infrastructure, buying the aircrafts and extracting them from Sudan would require extensive planning with multiple parties.  However, buying the aircraft parts was offered as the first and

easier step to be in possession of parts to be used with the Sudanese C-130s that were to be purchased from Sudan. Accordingly, Evan began working closely with Jason in furtherance of Tempest's goal to purchase the two aircraft. Moreover, a portion of the funds related to purchase of the Parts was to be used to fund travel and expenses in Sudan in connection with the acquisition of the Sudanese C-130s.

31.   Jason wanted to gain Eric's trust and demonstrate the desirability and value of the Parts being offered. Thus, Jason made sure Eric received copies of purchase orders allegedly received by GAL from Transcend Aero Services concerning the Parts. The purchase order identified documents included in the purchase of the Parts as: "Global Aero Leasing COC, and All relevant Lockheed Martin documents, OUE logbooks and Global Aero Leasing COC to be provided." See Exhibit 1. Evidently, Jason chose to enclose purchase orders identifying the documents that were material to the purchase of the Parts.[1]

32.   Despite the importance of maintenance records in aviation to ascertain the history of parts and maintenance, the reality was that Jason, Zach, Michael, and GAL did not have complete maintenance documents for the Parts that were being offered to Tempest. In fact, Tempest was never told the Parts did not have the corresponding maintenance documents.

33.   From the beginning of the project, Evan engaged in multiple phone calls per week with Jason and another broker, Carlos Gomez, to discuss developments related to the purchase of the two aircraft.

34.   On July 20, 2021, Jason and Primetech, implying that they had discussions with a committee with decision power concerning the sale of the Sudanese C-130s, sent Evan what Jason

---

[1] At this juncture, the legitimacy of the purchase orders is at issue.

described as: "the agreement we put forward to the committee."  See Email Attached as **Exhibit 2.**

35.     Relying on the representations made that there was interest on the part of the Sudanese government to sell the two Sudanese C-130s, Eric on behalf of Tempest, signed a letter of intent, detailing the terms of an offer to be provided to the Sudanese government based on the "agreement" Jason and Primetech, had put forward to the "committee."

36.     On or around July 21, 2021, Eric on behalf of Tempest, signed a document created by Jason and Primetech for the two Sudanese C-130s. A copy of the document is attached hereto as **Exhibit 3.**

37.     In the signed document, Tempest was in agreement to:

a.  Put $2,000,000.00 for the purchase of each of the aircraft, or $4,000,000.00 total, into an escrow account;

b.  Invest in the full evaluation and repairs for the ferry flight to Amman Jordan; and

c.  Invest in the full Periodic Depot Maintenance ("PDM") on each aircraft. The PDM was estimated to be $4,000,000.00 and $5,000,000.00 per aircraft.

See Ex. 3.

38.     Once a plan was in place, Tempest was eager to move forward but progress was slow. After Tempest expressed frustration, Jason removed Carlos Gomez from the project.  On August 8, 2021, a different broker, Zach Janzen ("Zach") began assisting with the project.

39.     Zach represented himself as Executive Vice President of Jet Procurement Services with Jet Pro, a Company that states in its website the following:

> We at Jetpro, repair, overhaul, modify and specialize in reverse engineering with new technology, including insertion, exchange, manufacture, routable management. With over 35 years of experience, we offer the know-how on anything related to Aerospace defense.  We do Government contracting and have a joint venture with FAA repair stations and FAA-PMA manufacturing facilities. We also service US-friendly Aerospace defense machinery.

7

40.     The two Sudanese C-130s aircrafts offered to Tempest by Jason and Primetech, as being "for sale" were owned by the Sudan government and had been used in the Sudan Air Force. Thus, Zach appeared to be a good fit to assist in the purchase of the two Sudanese C-130s.

41.     Tempest was informed by Zach, who appeared to be bullish on the deal throughout the process, that inspections should proceed because of the leverage that would be gained in demanding a lower price for the Sudanese C-130s.

42.     During calls between July 21, 2021, and August 16, 2021, Jason, Zach and Evan regularly discussed the scope of work needed to acquire the aircraft and status updates on efforts to acquire the aircraft. Eventually a plan was formed.

43.     In fact, on August 10, 2021, Zach specifically discussed the "Sudan Extraction" of the aircraft, making it seem as though the purchase was in fact moving forward and the only items left involved inspections and flying the aircraft out of Sudan.  Zach stated that the two aircraft had not been run in 3 years and had not been stored properly. In fact, the aircraft had not been flown in 8-10 years.

44.     Zach indicated that getting a signature from the Sudanese government guaranteeing a fair price is a priority and that Jason is an "expert in that regard." On or around August 10, 2021, Jason told both Evan and Zach that he had made great strides in getting the Sudanese government to lower their expectations on pricing.

45.     On August 16, 2021, while inducing Tempest to believe that the transaction was moving forward, Zach, individually and writing as Executive Vice President of Jet Procurement Services with Jet Pro, sent an email to Eric, Evan, and Jason, attaching a document that appears to have been prepared by Jason detailing "Next Phase 2."  Zach also requested payment of certain invoices for Tempest to pay.

8

46.     The "Next Phase 2" document sent by Zach states:

Aircraft evaluation and engine run ups:

1)      Jordanians (JAC) green lit for the first week of September for full aircraft evaluation (estimated 10 days to complete)
        a.      JAC team bringing their own hand tools, borescope, aircraft battery
        i.      Kindly note that for shipping of battery and General Tool Box for 8 days will be $4100, (Loan rate per day $400)  Shipping is estimated to $900.
        b.      WE need to provide all the consumables (previously listed) and one fuel control unit for the engine runs (DON'T SEND ANY MONEY UNTIL I GIVE THE OK)
        c.      Hotel accommodations (Meals includes) at the Safat aviation complex along with airfare for the JAC team will need to be taken care of.
        i.      JAC team hotel accommodations w/ meals included (50 per person per day x 5 people for 10 days estimated = 2500)
        ii.     JAC will bill us for the airfare of their team to be paid with the balance of the evaluation
2)      Once evaluations are complete, final negotiations will be hammered out for the official purchase agreement to be followed.  3rd phase does not begin without the purchase agreement being finalized.
3)      The evaluation will set the stage for the 3rd phase of the project which will be to repair the aircraft and make ready for ferry flight to Jordan.
        a.      If the aircraft require significant repairs, it is suggested to use one aircraft as a donor bird (to supply parts to the better of the two). Perform the repair and ferry one aircraft at a time to mitigate the risk.
        b.      IF both aircraft require minimum repair, we can possibly repair both simultaneously and ferry fly simultaneously (The outcome of the evaluation will dictate this).
        c.      The key here is to due this as quickly as possible.

In process of locking down the itinerary now.

**Zach, please confirm if the Jordanians have any engines for lease in the event that we need them for the ferry flight.

47.     The plan as presented to Tempest, was for a Jordanian aviation company, Jordan

Aeronautical-systems Company ("JAC") to send a team of engineers to the Safat Aviation Group's

("Safat") complex in Khartoum, Sudan. Upon arrival, the Jordanian engineers would evaluate the two aircraft and make any repairs necessary. The engineers would then fly the aircraft to Jordan.

48.     While working on this project, Jason and Zach made various requests for payments. Jason told Evan, that these payments were required to achieve the larger goal of acquiring the two Sudanese C-130s.

49.     The representation that the transaction was moving forward in connection with the Sudanese C-130s was material to Tempest's decision to continue discussing the purchase of the aircraft parts. Moreover, the representations were material to Tempest making certain payments for inspections and other claimed expenses.

50.     Based on the request from Jason and Zach, Tempest made the following payments from United Federal Credit Union Account No. (ending in) XXXXXXXX3545:

| Date | Amount and Payee | Purpose of Payment |
| --- | --- | --- |
| 6/30/2021 | $2,627.53 to Jason | This was reimbursement for the cost of airfare and related expenses for a trip that Jason took to Sudan to inspect the Sudanese C-130s. |
| 6/18/2021 | $13,000 to Jordan Aeronautical Systems | This payment was made for the alleged survey of the two Sudanese C-130s in Sudan. |
| 8/20/2021 | $25,000 to Zach Janzen | Initial payment for consulting services in connection with project to acquire two Sudanese C-130s |
| 8/17/2021 | $27,812.17 to King Arrow Management | This was payment for Sudanese C-130s parts purportedly needed in connection with the acquisition of the aircraft stored in Sudan |
| 8/25/2021 | $2,505 to Smart Link Ltd. | Payment for accommodations of Jordan Aeronautical Systems personnel during alleged survey of aircraft in Sudan |
| 8/19/2021 | $52,105 to Smart Link Ltd. | Payment for fuel, oil, grease and other materials allegedly transported to Sudan in connection with Jordan Aeronautical Systems' alleged survey of Sudanese C-130s aircraft in Sudan |

51.     On September 13, 2021, Zach sent Tempest LLC a completed escrow information sheet for the purchase of the aircraft requiring payment of $8,000,000, identifying four serial numbers for C-130 aircraft.  The escrow document names Tempest in the purchaser information, Jason, Patriot Dynamics and Zach in the section discussing the Broker's for Purchaser, and in the section of the Seller, it named the Sudan Ministry of Defense.

52.     Meanwhile, while the survey was allegedly being completed between September 9, 2021 and September 17, 2021, Jason and Zach represented they were going to be present, in Sudan, as to update Tempest, ensure the work was being completed and the purchase agreement was finalized with Sudan's Ministry of Defense.  The presence of Jason and Zach in Sudan for the inspection and to negotiate the purchase agreement was material to Tempest, and importantly, the expense was to be covered from the monies charged for the sale of the Parts.

53.     As a result of the representations that the two Sudanese C-130s were going to be sold to Tempest by the Sudan Ministry of Defense, Tempest's conversations, with Zach and Jason continued to move forward in connection with the purchase of the Parts.

54.     Notably, Zach and Jason made the following representations regarding the Parts to Tempest:

     a.  In late August of 2021, Zach represented to Evan that even if the Parts were not used in connection with the acquisition of the Sudanese C-130s stored in Sudan, the Parts could be sold at a profit.

     b.  On or about August 28, 2021, Zach represented to Evan that the Parts included complete copies of flight, inspection, and maintenance logbooks and that the CWB came complete with a data plate via phone.

     c.  On or about September 16, 2021, Zach represented to Evan, via phone, that the Parts were being stored at Rickenbacker Airport under an existing and valid lease but that the lease had ended. He said the parts needed to be moved, to impart a sense of urgency on the part of Tempest to purchase the parts, before they were locked up in a dispute with the lessor (in fact, GAL had terminated the lease themselves

11

by failing to pay the last 2 months and provide proof of insurance of the Parts at that location).

55.     In reliance of the above-stated representations (a-c) made by Zach and Jason and those made on June 11, 2021 (see also paragraph 26(a-b)) made by Jason and the representations and omissions made related to the log documents that were part of the sale of the Parts, and while relying on the representations concerning the sale of the Sudanese C-130s, including the representations made by Zach and Jason that the Sudan Ministry of Defense was going to sell the two Sudanese C-130s to Tempest, and that Jason was on location in Sudan during the inspection and in discussions concerning the finalization of the purchase agreement, Tempest agreed to purchase the Parts for $1,650,000.00. A Bill of Sale dated September 21, 2021, signed by Michael Sheldon in his capacity as "President" of GAL identifies GAL as the "Seller" and Tempest as the "Buyer" of the Parts and the transaction was funded that same day. A copy of the Bill of Sale is attached hereto as **Exhibit 4.**

56.     Zach waited until September 28, 2023, after the payment by Tempest of the monies related to the Parts, to send a copy of the survey completed by Jordan Aeronautical Systems between September 9, 2021, and September 17, 2021, of the two Sudanese C-130s.

57.     No purchase agreement with the Sudan Ministry of Defense was ever provided to Tempest.

58.     After September 28, 2021, it became clear to Tempest that Jason and Zach had lied about being in Sudan during the critical inspection, and to negotiate a contract with the Sudan Ministry of Defense.

59.     On October 8, 2021, Tempest requested the address where the Parts were located.

60.     After remitting payment for the parts, Eric, on behalf of Tempest, sent Evan to Ohio to inspect the parts—which he was told were being properly stored in an airport hangar.

12

61. Defendants' stacked misrepresentations began to topple, one by one, until it was clear they had all been lying to Tempest.

62. First, Defendants were forced to reveal that the Ohio parts were actually being held at a farm.

63. After the location of the parts was revealed, Defendants had no choice but to tell Evan and Eric that the farm owner, Mr. David Beam, was owed past due rent for storage of the parts. Those monies had to be paid by Tempest for the release of the parts.

64. On October 11, 2021, Zach, who previously told Evan and Eric that he was in Sudan overseeing the acquisition of the aircraft just days earlier admitted that he lied about being in Sudan.

65. Upon learning the truth about the Parts not being in a hangar, not having all of the maintenance documents for the Parts, that rent was not paid for the parts, and the truth about the failure to be present in Sudan when they claim to be there, and the fact that Sudan aircraft "negotiations" appear to have been a façade, Tempest demanded a refund for the cost of the Parts but was told that was not possible. After learning about these misrepresentations, Tempest lost all trust in Defendants and could not continue with the Sudanese aircraft deal.

66. As a result of Defendants' misrepresentations, Tempest was left without the two Sudanese aircraft it sought to acquire, after spending considerable time and money in furtherance of the objective with nothing but aircraft parts purchased under dishonest pretenses.

## COUNT I-FRAUDULENT MISREPRESENTATION AGAINST ALL DEFENDANTS

67. The allegations contained in paragraphs 1 through 66 are incorporated by this reference as if set forth fully herein.

13

68.     Defendants intentionally made false statements regarding material facts about the Sudanese C-130s and Parts to Tempest. Specifically, the Defendants made the following statements concerning the Parts:

a.  On June 11, 2021, Jason, while acting individually and on behalf of Primetech and GAL, represented to Evan via telephone, that there were certain airplane parts that were "assets" Jason, and Michael Sheldon owned, along with GAL, and they were stored in a secured hangar in Ohio.  Jason represented that these Parts were for a C-130E aircraft (hereinafter "the Parts"), and it would make sense for Eric Litak to buy those assets to use as parts for the Sudanese C-130s aircraft.

b.  On or about June 11, 2021, during a phone call, Jason represented to Evan that the Parts were being properly stored in a hangar at Rickenbacker Airport in the State of Ohio.

c.  In a June 11, 2021, e-mail, Jason represented to Evan that the Ohio Parts had a total value of $2,200,000.00. Specifically, the wing box ("C-130 CWB") had a value of $1,200,000.00 alone and the wings were worth $1,000,000.00.

d.  Jason sent purchase orders allegedly received by GAL from Transcend Aero Services concerning the Parts identifying documents that came with the Parts, including: "Global Aero Leasing COC, and All relevant Lockheed Martin documents, OUE logbooks and Global Aero Leasing COC to be provided." See Exhibit 1.

e.  Jason and Zach represented they were in Sudan for the inspection of the Sudanese C-130s and to negotiate the purchase agreement, which expense part of the monies charged for the sale of the Parts.

f.  In late August of 2021, Zach represented to Evan that even if the Parts were not used in connection with the acquisition of the Sudanese C-130s stored in Sudan, the Parts could be sold at a profit.

14

g. On or about August 28, 2021, Zach represented to Evan that the Parts included complete copies of flight, inspection, and maintenance logbooks and that the CWB came complete with a data plate via phone.

h. On or about September 16, 2021, Zach represented to Evan, via phone, that the Parts were being stored at Rickenbacker Airport under an existing and valid lease but that the lease had ended. He said the parts needed to be moved, to impart a sense of urgency on the part of Tempest to purchase the parts, before they were locked up in a dispute with the lessor (in fact, GAL had terminated the lease themselves by failing to pay the last 2 months and provide proof of insurance of the Parts at that location).

i. Provided false statements of purchase orders attached as Exhibit 1.

j. Charged additional monies for "crating" the Parts, when said amount was a false charge.

69. Defendants made the following false statements concerning the Sudanese C-130s:

a. On June 11, 2023, Jason represented the Parts would be procured through their assistance because they were already at a hangar in Ohio and could be used as Parts for the Sudanese C-130s.

b. On July 20, 2021, Jason and Primetech, implying that they had discussions with a committee in Sudan with decision power concerning the sale of the Sudanese C-130s, sent Evan what Jason described as: "the agreement we put forward to the committee."  See Email Attached as **Exhibit 2.**

c. On August 10, 2021, Zach specifically discussed the "Sudan Extraction" of the aircraft, making it seem as though the purchase was in fact moving forward and the only items left involved inspections and flying the aircraft out of Sudan.  Zach stated that the two aircraft had not been run in 3 years and had not been stored properly. In fact, the aircraft had not been flown in 8-10 years.

d. On or around August 10, 2021, Jason told both Evan and Zach that he had made great strides in getting the Sudanese government to lower their expectations on pricing.

15

e. On August 16, 2021, while inducing Tempest to believe that the transaction was moving forward, Zach, individually and writing as Executive Vice President of Jet Procurement Services with Jet Pro, sent an email to Eric, Evan, and Jason, attaching a document that appears to have been prepared by Jason detailing "Next Phase 2."

f. Provided invoices in August 16, 2021, with fraudulent amounts representing that those amounts were owed for services and goods allegedly provided.

g. Requested payments for fraudulent expenses as detailed in allegation No. 50.

h. Zach claimed Jason was in Sudan in early September 2021, also claimed he was in Sudan and Zach claimed he went to Sudan on September 23, 2021. Hence, Jason and Zach lied about being in Sudan during the critical inspection, and for the purpose of negotiating a contract with the Sudan Ministry of Defense

i. On September 13, 2021, Zach sent Tempest LLC a completed escrow information sheet for the purchase of the Sudanese C-130s naming Tempest in the purchaser information, Jason, Patriot Dynamics and Zach in the section discussing the Broker's for Purchaser, and in the section of the Seller, naming the Sudan Ministry of Defense.

70. Defendants intended that Tempest, through its agents, Eric and Evan, would rely on their false statements.

71. Tempest did in fact rely on these statements in its decision to proceed and pay $1,650,000.00 for the Parts, and to pay for invoices for the alleged work and services that were fraudulent concerning the Sudanese C-130s.

72. Tempest was damaged by relying on Defendants' false statements.

WHEREFORE, Plaintiff, Tempest, LLC demands judgment against Defendants, Global Aeroleasing, LLC, Patriot Dynamics, LLC, Primetech Resources LLC; Jason Baumann and Zach

Janzen, **jointly and severally**, for compensatory damages and punitive damages, prejudgment and post judgment interest, and taxable costs.  Tempest LLC demands a trial by jury on all issues so triable.

## COUNT II- NEGLIGENT MISREPRESNTATION

73.     The allegations contained in paragraphs 1 through 66 are incorporated by this reference as if set forth fully herein.

74.     Defendants negligently made statements regarding material facts concerning the Parts and the Sudanese C-130s to Tempest, including statements, as alleged in paragraphs 1 through 66 causing Plaintiff to be induced to believe that Defendants had access to the Sudanese C-130s and to decision makers in the Sudan Ministry of Defense.  Moreover, Defendant made statements concerning documents that would be included in the sale of Parts, and made statements concerning the usefulness of the parts given the impending purchase of the Sudanese C-130s.

75.     Defendants made these statements concerning material facts and believed them to be true when they were actually false. For example:

      a. Defendants believed they had all of the maintenance documents for the Parts, when in fact they did not;

      b. Defendants believed the Sudan Ministry of Defense was interested in selling the Sudanese C-130s, when in fact, Defendants did not have confirmation in writing from the Sudan Ministry of Defense that such sale would take place;

76.     Defendants were negligent in making these statements because they should have known the statements were false.

77.     Defendants made the false statements about the Parts and the Sudanese C-130s with the intention that Tempest, and its agents, including Evan and Eric, would rely on those statements.

17

78.     Tempest justifiably relied on Defendants' false statements.

79.     Defendants must be deemed to have acted with wanton disregard toward the property rights of Tempest. Therefore, the actions undertaken by Defendants in making statements Defendants knew or should have known to be false statements, constitute gross negligence.

80.     Specifically, Defendants:

   a.  knew that they did not have authority to represent to Tempest that the Sudan Ministry of Defense was interested in selling the Sudanese C-130s to Tempest.

   b.  knew they did not have any offers from someone with authority at the Sudan Ministry of Defense for the sale of the Sudanese C-130s to Tempest; and

   c.  knowingly used the façade of a sale of the Sudanese C-130s to Tempest to consummate the sale of the Parts that were laying around in a barn in Ohio.

81.     Tempest's justifiable reliance on the false statements was the legal cause of Tempest's damages, including the payment of $1,650,000 for Parts that would be used with the Sudanese C-130s; payment of invoices for services and goods related to the alleged sale of the Sudanese C-130s.

WHEREFORE, Plaintiff, Tempest, LLC demands judgment against Defendants, Global Aeroleasing, LLC, Patriot Dynamics, LLC, Primetech Resources LLC; Jason Baumann and Zach Janzen, **jointly and severally**, for compensatory damages and punitive damages, prejudgment and post judgment interest, and taxable costs.  Tempest LLC demands a trial by jury on all issues so triable.

Respectfully Submitted on this 21st day of September, 2023.

By:  /s/ Daniel Lustig
Daniel Lustig, Esq.
Florida Bar No.: 59225
PIKE & LUSTIG LLP

1209 N. Olive Avenue
West Palm Beach, FL 33401
Phone: (561) 855-7585 Main
Facsimile: (561) 855-7710
Email: pleadings@pikelustig.com
COUNSEL FOR: TEMPEST, LLC